J-A07028-26 2026 PA Super 159

ROBERT B. SHER, JR. : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
v. :
:
:
:
READING ANTHRACITE COMPANY : No. 1859 MDA 2024

Appeal from the Order Dated November 27, 2024
In the Court of Common Pleas of Schuylkill County Civil Division at
No(s): S-42-2015

ROBERT B. SHER, JR. : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
READING ANTHRACITE COMPANY :
:
Appellee : No. 34 MDA 2025

Appeal from the Order Dated November 27, 2024
In the Court of Common Pleas of Schuylkill County Civil Division at
No(s): S-42-2015

BEFORE: BOWES, J., DUBOW, J., and NEUMAN, J.

OPINION BY DUBOW, J.: **FILED: JULY 27, 2026**

Designated Appellant, Robert B. Sher, Jr., representing a class of cotenants ("Cotenants"), appeals from the November 27, 2024 Order entered in the Schuylkill County Court of Common Pleas denying post-trial relief in this litigation involving rents and royalties on coal lands. Appellee, Reading Anthracite Company ("RAC"), files a cross-appeal. After careful consideration, we affirm.

This protracted litigation involves four Schuylkill County tracts of land which are currently co-owned by Cotenants and RAC (collectively, the "Coal Tracts"). RAC owns the following undivided interests in the four tracts: 75% in the Ellmaker Tract and the Lee Lands Tract; approximately 67% in the East Flowery Field Tract, and 50% in the Sawmill Tract. Trial Ct. Op., 10/10/24, at 2-3. The class of approximately 50 Cotenants "hold[s] fractional undivided interests in the land and the subsurface of the Coal Tracts." *Id.* at 2.

Beginning in 1961, a predecessor of RAC entered into multi-year leases with Cotenants or their predecessors to mine the Coal Tracts, with renewal options. Through the following decades, the parties renewed the leases, with the interest of the Cotenants represented by trustees. As the leases approached expiration in 2000, the banks serving as trustees indicated that they would not continue as trustees.

On February 4, 2000, RAC sent a memorandum to the known interest holders proposing "to go forward without a written agreement but rather on the strength of the arrangement set forth in [the memorandum]." Memorandum, 2/4/2000, at 1 ("2000 Memorandum"). RAC acknowledged its duty under Pennsylvania law to "fairly account to the co-tenants for the operations it conducts on the co-owned property." *Id.* The 2000 Memorandum provided the following relevant terms:

- For the Wadesville Pit on the Ellmaker and East Flowery Field Tracts, RAC asserted that it would pay a "fair royalty" which it asserted would "continue the status quo in terms of royalty payments" under the most recent lease extension. *Id.* at 2.

- RAC stated that it would pay $1.06 per "net ton of rough clean coal produced[,]" which it claimed was the amount that would have been payable under the then-present agreement. It agreed to "mail checks on a quarterly basis." *Id.*

- RAC next asserted that beginning with the March 2000 real estate tax bills, "each owner of a fractional interest would be responsible for his or her own portion of the real estate taxes on the property." *Id.* RAC also indicated that the co-owners should obtain their own insurance. *Id.*

In March 2000, an attorney representing Sher wrote RAC reserving his rights but did not take any other action for 15 years, during which time RAC "intermittently paid royalties to Sher and many other members of the putative class[.]" Trial Ct. Op. at 4, 28. Other cotenants also contacted RAC objecting to aspects of the 2000 Memorandum but "none objected to the royalties they received." *Id.* at 29.

In 2012, RAC began receiving royalties from Pottsville Materials, LLC, related to its operation of a quarry and asphalt plant on the Lee Lands Tract. Despite receiving over $1 million from Pottsville Materials during the relevant time, RAC did not distribute the revenue to the Cotenants, which the court subsequently calculated would have resulted in royalties to the Cotenants totaling $28,000.00 annually.[1]

In January 2015, Sher, as representative of a putative class of Cotenants, filed the instant action asserting, *inter alia*, claims of breach of fiduciary duty based on RAC's failure to pay Cotenants their fair share of the

---

[1] RAC failed to disclose these royalties until March 2020. The court granted Cotenants' request for counsel fees related, *inter alia*, to the time "required to remedy these deficiencies." Trial Ct. Op. at 33-35.

- 3 -

rental value and proceeds from the Coal Tracts. The Cotenants also sought an accounting to obtain their "proportionate share of the rental value of the Coal Tracts and the proceeds earned by RAC . . . from its use of the Coal Tracts[.]" Amended Complaint - Class Action, 3/27/15, ¶¶ 97-102.

Sher filed for class-certification in September 2019, which the court ultimately granted in November 2020. The court then found the six-year statute of limitations applicable to accounting claims and ordered RAC to "account for royalties, rent, and proceeds derived from the [C]oal [T]racts from six years prior to the filing of the instant class action on January 9, 2015." Trial Ct. Op. at 5-6.

A bench trial occurred in two segments: February 6-9, 2023, and May 1-3, 2023, after which Cotenants sought to amend the complaint to add a claim of unjust enrichment.[2]

On October 10, 2024, the court entered an order and opinion. First, the court denied Cotenants' reassertion of their motion to add an unjust enrichment claim, noting that a prior judge had found Cotenants' prior unjust enrichment claim to be "legally insufficient" on August 12, 2015. Trial Ct. Op. at 7.

After acknowledging that "the law is clear that RAC as a co-tenant has the right to mine the minerals and pay the proportionate share of the royalty to the minority cotenants," the court engaged in extensive fact-finding

---

[2] Cotenants previously sought to amend their complaint to add a claim of unjust enrichment, which the court denied on August 12, 2015.

- 4 -

regarding the royalties, specifically addressing the parties' experts and their experience related to anthracite coal valuations as well as the issues specific to the Wadesville Pit mine. *Id.* at 13, 14-29. The court found RAC's expert more credible than Cotenants' expert and concluded that RAC's royalty rates from 2009-2023 were "fair and reasonable" but made certain adjustments that resulted in $27,886.00 in additional royalties for Cotenants. Trial Ct. Order and Verdict, 10/10/24, at ¶¶ 2, 4. In addition, the court permitted RAC "to deduct 15% from the estimated raw coal tonnage delivered from the Wadesville mine for debris removed to establish rough clean coal tonnage." *Id.* at ¶ 5. The court also allowed RAC to impose a 10% administrative fee on "royalty payments and/or revenues" received "from Pottsville Materials, Famous Reading Outdoors and any new sources of revenue arising from the Coal Tract Leases[.]" *Id.* at ¶ 6.

The court imposed on RAC, however, responsibility for the real estate taxes and insurance premiums on land which RAC is "actually mining or intends to mine in the future[,]" with the taxes and insurance related to other properties to be "shared in their proportionate ownership interests." *Id.* at ¶ 7. The court found that RAC had improperly deducted $105,068.43 for real estate taxes from the 2009-2021 royalty payments paid to Cotenants. *Id.*

Finally, the court ordered RAC to pay prejudgment interest of $7,976.07 on the royalty and the real estate tax adjustments and $52,969.00 in attorney fees. *Id.* at ¶¶ 8, 13. The court also required RAC to provide each class

- 5 -

member with an annual accounting and permitted Sher, as the lead class member, to inspect the properties. *Id.* at ¶ 9-12.

Both parties filed motions for post-trial relief, raising issues which include those raised on appeal. On November 27, 2024, the court denied both motions and entered final judgment on the October 10, 2024 verdict.

On December 23, 2024, Cotenants filed a notice of appeal. On December 27, 2024, the trial court entered its Pa.R.A.P. 1925(a) opinion incorporating its prior opinions. On January 6, 2025, RAC filed a cross appeal.[3]

**Cotenants' Appeal**

Cotenants raise the following issues on appeal:

A. Did the [t]rial [c]ourt err and/or abuse its discretion in concluding that RAC's 2000 Memorandum created an implied-in-fact contract, when there was no evidence that all Class members received the 2000 Memorandum, the Class objected to the terms in the 2000 Memorandum, and RAC acted inconsistently with the terms of the 2000 Memorandum?

B. Was the [t]rial [c]ourt's determination that RAC's coal royalty rate was reasonable against the weight of the evidence, where the [t]rial [c]ourt failed to apply the royalty rate set by federal and state statutes and by comparable anthracite coal leases?

C. Did the [t]rial [c]ourt err and/or abuse its discretion by allowing RAC to impose 15% "processing loss" coal tonnage reduction where the record is devoid of any evidence that a 15% tonnage reduction is a standard or acceptable practice in Pennsylvania and

_____

[3] The trial judge had retired prior to the filing of RAC's cross-appeal, and the president judge reassigned the case to a different judge. The new judge did not file a separate Pa.R.A.P. 1925(a) opinion; however, we are able to review RAC's issues raised on appeal without the assistance of a Rule 1925(a) opinion because the original trial court judge addressed the same issues in its November 27, 2024 opinion dismissing RAC's post-trial motions.

where RAC did not produce evidence establishing a 15% processing loss?

D. Did the [t]rial [c]ourt err and/or abuse its discretion by allowing RAC to impose a 10% administrative fee on all non-mining revenue generated by the Coal Tracts, where the record was devoid of any evidence that the Class consented to the administrative fee or that the administrative fee represented actual administrative costs incurred by RAC?

E. Did the [t]rial [c]ourt err when it denied the Class's Motion to Amend the Amended Complaint to add an unjust enrichment claim, where the evidence established that the Class conferred benefits upon RAC, that RAC appreciated those benefits and that it would be unjust for RAC to retain those benefits without payment to the Class?

Cotenants' Br. at 7-8 (suggested answers omitted).

## A. Implied Contract

In their first issue, Cotenants assert that the trial court "erred as a matter of law and/or abused its discretion in concluding that RAC's 2000 Memorandum created an implied-in-fact contract." *Id.* at 38. First, Cotenants emphasize that the individual members did not consent to the terms of the 2000 Memorandum or arrive at the requisite "meeting of the minds" with RAC. *Id.* at 39-46. Second, Cotenants assert that the court erred in concluding that an implied contract existed when RAC acted inconsistently with the terms of the 2000 Memorandum, for example by failing to send quarterly royalty checks. *Id.* at 46-48.

While Cotenants provide substantial citation to the record and caselaw in support of their argument that the parties did not have an implied contract, Cotenants, notably, do not indicate where the trial court held in its verdict or opinion that an implied contract existed. *Id.* at 38-39, 45-46, 48. Indeed,

our careful reading of the trial court's verdict and opinion reveals that the court did not conclude that an implied contract existed. Rather, the court expressly opined that it was "superfluous for the [c]ourt to decide whether there was indeed a meeting of the minds" for purposes of finding an implied contract. Trial Ct. Op. at 13.

The court explained that the "major issue" in the case was not whether there was an implied contract but rather "whether RAC's calculation of the royalty for the 'raw clean coal' per ton is fair and reasonable as the individual class members['] proportionate interest"—an issue which sounds in long-standing Pennsylvania law relating to the right of a cotenant in possession of co-owned property to mine the property so long as it pays the other cotenants their proportionate share of the proceeds.[4] *Id.* at 13; *see*, *e.g.*, 68 P.S. § 101.[5] In other words, the trial court properly found that Cotenants' rights emanate from their status as cotenants out of possession and, thus, their remedy is to obtain an accounting from the cotenant in possession and not damages from a breach of contract claim. Accordingly, we conclude that

_____

[4] Likewise, the verdict did not address an implied contract or a meeting of the minds but rather decreed that the "royalty rates calculated by [RAC] for 2009 through 2023 are fair and reasonable when adjusted[.]" Trial Ct. Order and Verdict at ¶ 2.

[5] We discuss the details of Section 101 below.

- 8 -

Cotenants' first issue warrants no relief, as the trial court did not base it decision on the existence of an implied contract.[6]

### B. Accounting Challenges

Having found that the trial court properly analyzed Cotenants' rights as emanating from their status as cotenants out of possession and thus, entitled to an accounting from RAC, as the cotenant in possession, we address Cotenants' remaining claims that relate to the trial court's assessment of whether RAC fulfilled its duties to account to Cotenants for their proportionate share of the Coal Tract proceeds under longstanding Pennsylvania law. As explained over a century ago, a cotenant in Pennsylvania has "a right to mine and sell coal but in doing so he necessarily [takes] the property of his cotenant and for that he is bound to account." *Reynolds v. Smith*, 70 Pa. Super. 194, 201 (1918). The Pennsylvania Supreme Court recently addressed accounting

---

[6] We recognize, however, that the trial court, in denying Cotenants' post-trial motions, rejected Cotenants' claim that it erred in finding an implied contract. Trial Ct. Op. - Cotenants' Post-Trial Mot., 11/27/24, at 1. The court's entire analysis of this issue is as follows:

> First, paragraphs 70 through 79 of our opinion support the decision of an implied contract which we found credible. Also as set forth in findings of fact 61, 59 and 60. In effect Plaintiff acquiesced to the terms and actions of the Defendant. As such, this complaint is unmerited for the weight of the evidence favored Defendant on this issue.

*Id.* at 2. While we agree with the trial court that the Cotenants' acquiescence to the terms in the 2000 Memorandum supports the existence of an implied contract between the parties, we note that the trial court did not explicitly make that finding but rather found that issue to be "superfluous." Trial Ct. Op. at 13. We, therefore, review the issues raised on appeal as a challenge to the trial court's accounting of the amounts owed.

claims between tenants in common pursuant to 68 P.S. § 101. *KEM Resources, LP v. Deer Park Lumber, Inc.*, 310 A.3d 142, 151 (Pa. 2024) ("*KEM Resources I*").

Section 101, originally adopted in 1895, provides as follows:

> In all cases in which any real estate is now or shall be hereafter held by two or more persons as tenants in common, and one or more of said tenants shall have been or shall hereafter be in possession of said real estate, it shall be lawful for any one or more of said tenants in common, not in possession, to sue for and recover from such tenants in possession his or their proportionate part of the rental value of said real estate for the time such real estate shall have been in possession as aforesaid; and in case of partition of such real estate held in common as aforesaid, the parties in possession shall have deducted from their distributive shares of said real estate the rental value thereof to which their co-tenant or tenants are entitled.

68 P.S. § 101.

Stated succinctly, "[a] claim under Section 101 has two requirements: "(1) the complaining party must show he is not in possession of the premises and (2) it must be shown that the remaining tenant-in-common occupies exclusive possession of the premises." *KEM Resources I*, 310 A.3d at 152 (citation omitted).[7] The parties acknowledge that RAC was the cotenant in possession and that Cotenants were not in possession of the Coal Tracts. Indeed, RAC stated in the 2000 Memorandum that "Pennsylvania law permits

_____

[7] As in the instant case, the plaintiff in *KEM Resources I* did not "explicitly invoke Section 101." *KEM Resources I*, 310 A.3d at 151. The Court nevertheless applied the statute, reiterating that "where the facts relied upon bring the case within the statute, it is not necessary to plead it." *Id.* at 150 (citation omitted).

[it], **as the co-tenant in possession of the property**, to conduct our mining operations, provided that we account fairly to the co-tenants either for their appropriate pro[ ]rata share of the profits of the operation, or a fair royalty." 2000 Memorandum at 2 (emphasis added).

Cotenants challenge the court's accounting determinations as being against the weight of the evidence. We accord a trial court's "findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial." *Kennedy v. Consol Energy Inc.*, 116 A.3d 626, 640 (Pa. Super. 2015) (citation omitted). "We will respect the trial court's findings with regard to credibility and weight of the evidence unless it can be shown that the lower court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." *Imbrenda v. Imbrenda,* 350 A.3d 1061, 1071 (Pa. Super. 2026) (citation omitted). We refuse to "substitute our judgment for that of the factfinder." *Kennedy*, 116 A.3d at 640 (citation omitted).

### 1. Royalties

Cotenants first dispute the court's conclusion that RAC's royalty rate was reasonable. Cotenants' Br. at 48-57. They argue that the court should have accepted their expert's testimony that the proper coal royalty rate is 12.5%,

pursuant to 30 U.S.C § 207(a) or 58 P.S. § 33.3. *Id.* at 48-50.[8] Cotenants proposed rate would result in unpaid royalties of approximately $4.5 million for the period between 2009-2021 including interest. *Id.* at 50. Alternatively, Cotenants argue for the application of the higher royalty rates of what their expert contended were three comparable leases. *Id.* at 51-57.

After extensive fact finding, the court concluded that RAC's royalty rates, as adjusted, were fair and reasonable. Trial Ct. Order and Verdict at ¶ 2; Trial Ct. Op. at 13-29. In so doing, the court found RAC's expert to be more credible than Cotenant's expert based upon RAC's expert's substantially greater experience with anthracite coal valuation as opposed to bituminous coal. *Id.* at 14-23. The court also recounted the "unique factors involved in mining" at the Wadesville Pit, which made it a "high-cost mine," as identified by RAC's expert. *Id.* at 17-22.

After careful review, we find that the trial court amply supported its conclusion. Cotenants failed to demonstrate that "the lower court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." *Imbrenda*, 350 A.3d at 1071. Based upon our well-established standard of review, we refuse Cotenants' request to reweigh the evidence and reassess the credibility of the expert witnesses. This claim warrants no relief.

**2. 15% Processing Loss Deduction**

---

[8] 30 U.S.C § 207(a) addresses coal mined on federal lands, and 58 P.S. § 33.3 governs the removal of oil and gas from state lands.

Cotenants next dispute the imposition of a 15% deduction for processing loss on the total coal tonnage. Cotenants Br. at 57-60. Cotenants contend that RAC did not inform them of the imposition of the deduction, nor did the Cotenants consent to its imposition. *Id.* at 57. Cotenants further claim that the 15% processing loss is an unsupported estimate based on the number of truckloads of raw coal, which are not weighed. *Id.* at 58-59. They emphasize that their asserted comparable leases do not contain a processing fee for debris removal. *Id.* at 59.

RAC responds that the 15% deduction has been applied to the relevant coal since 1961. RAC's Br. at 5. It emphasizes that RAC employees testified that there was at least a 15% reduction in tonnage for debris due in part to "old timber, mine rails, and tools in the underground mine" at the Wadesville Pit. RAC's Br. at 35-38.

After hearing extensive testimony, the court concluded that RAC was "entitled to deduct 15% from the estimated raw coal tonnage delivered from the Wadesville mine for debris removed to establish rough clean coal tonnage before calculating the royalty owed[.]" Trial Ct. Order and Verdict at ¶ 5. In so doing, the court relied upon its credibility determinations of the "witnesses especially the two experts." Trial Ct. Op. - Cotenants' Post-Trial Mot. at 2-3. As with the prior issue, we refuse to reweigh the evidence, especially where the court's findings are based on its assessment of expert testimony. This issue warrants no relief.

### 3. 10% Administrative Fee

Cotenants next challenge the imposition of the 10% administrative fee beginning in 2021, which RAC applied retroactively to 2009 for "non-mining revenue generated from the Coal Tracts, including the Pottsville Materials, Famous Reading Outdoors and Ground Leases." Cotenants' Br. at 61-62. Cotenants reiterated that they did not agree to this newly imposed term. *Id*. at 61. Moreover, they contend that the fee does not bear any relationship to the cost of administering the revenue streams and that RAC failed to support the fee with evidence. *Id.* at 61-62. Cotenants claim that RAC owes them $43,253.00 plus interest based upon the imposition of this fee. *Id.* at 62.

Based upon its review of the evidence, the court permitted RAC to deduct a 10% administrative fee for revenues received from specific non-mining sources before calculating the amount it owed to Cotenants. Trial Ct. Order and Verdict at ¶ 6. The court explained that the imposition of a 10% administrative fee was reasonable considering Cotenants' trustees' imposition of an 8% administrative fee prior to 2000.[9] Trial Ct. Op. - Cotenants' Post-Trial Mot. at 3. As with the prior issues, we find no basis to reject the trial court's weight and credibility determinations.

**E. Unjust Enrichment**

In their final claim, Cotenants argue that the trial court erred in denying their request to amend the complaint to add a claim for unjust enrichment.

---

[9] RAC states that the imposition of a 10% administrative fee on non-mining royalties resulted in approximately a 3% fee on total revenues between 2009-2021. RAC Br. at 5, 39-41.

Cotenants' Br. at 62-65. Specifically, they posit that RAC was "unjustly enriched by paying an unfair and unreasonable royalty rate[,]" "reducing the coal tonnage by 15%[,]" and by imposing the "10% 'administrative fee[.]'" *Id.* at 64-65 (capitalization omitted).

A trial court has "broad discretion to grant or deny a petition to amend" a complaint. *Pollock v. Nat'l Football League*, 171 A.3d 773, 778 (Pa. Super. 2017) (citation omitted); *see generally* Pa.R.Civ.P. 1033 (governing amendments). Accordingly, we will reverse a trial court's order denying leave to amend a complaint "only if the trial court erred as a matter of law or abused its discretion." *Pollock*, 171 A.3d at 778 (citation omitted). While trial courts should liberally grant amendment, they should deny amendment "where a party will be unable to state a claim on which relief could be granted[.]" *Id.* (citation omitted).

"The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. 2001) (citation and internal quotation marks omitted). "The most significant element of the doctrine is whether the enrichment of the defendant is unjust[.]" *Id.*

As noted above, we affirmed the trial court's determination that RAC's royalty rate, the 15% tonnage reduction, and the 10% administrative fee were

- 15 -

reasonable. A claim of unjust enrichment logically cannot stand where the trial court has found the allegedly "unjust" benefit to the defendant to be reasonable. Accordingly, Cotenants' claim for unjust enrichment would not warrant relief, and thus, we reject Cotenants' argument.

In sum, we reject Cotenants' challenges to the trial court's order.

## RAC's Cross-Appeal

RAC raises the following issues on appeal:

A. Did the trial court err by certifying a class action considering that each fractional owner of the Coal Tracts maintains a separate and distinct title, and therefore must bring suit independently, and because [Cotenants] failed to meet all of the criteria to certify a class?

B. Did the trial court err by finding in favor of [Cotenants] with respect to the payment of property taxes on mineral parcels since an implied contract was created between the parties and the doctrine of laches warrants that the real estate taxes on mineral parcels shall be shared in the parties' proportionate ownership interests?

C. Did the trial court err by ordering pre-judgment interest because pre-judgment interest can only be awarded as a matter of law when a breach of contract occurs and a definite sum of money is due?

RAC Initial Brief at 4 (suggested answers and some capitalization omitted).

### A. Class Certification

RAC's first issue challenges the trial court's grant of class certification, which "presents a mixed question of law and fact." *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 15 (Pa. 2011). Challenges alleging that the court utilized an improper legal standard or misapplied procedural requirements raise questions of law, over which our standard of review is *de*

- 16 -

*novo*, and our scope of review is plenary. ***See id.*** However, we employ an abuse of discretion standard in reviewing the court's application of the procedural requirements, observing that a "trial court is vested with broad discretion in deciding whether an action may be pursued on a class-wide basis[.]" ***Id.***

The Rules of Civil Procedure provide that "[o]ne or more members of a class may sue . . . on behalf of all members in a class action only if" the class satisfies the following requirements:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> (4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709;[10] and
>
> (5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.[11]

_____

[10] Rule 1709 mandates courts to consider "(1) whether the attorney for the representative parties will adequately represent the interests of the class, (2) whether the representative parties have a conflict of interest in the maintenance of the class action, and (3) whether the representative parties have or can acquire adequate financial resources . . . ." Pa.R.Civ.P. 1709.

[11] Rule 1708 instructs courts to consider other criteria including the following in cases involving monetary recovery: "(1) whether common questions of law or fact predominate . . . ; (2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;[and] (3)
*(Footnote Continued Next Page)*

- 17 -

Pa.R.Civ.P. 1702. "[T]he proponent of the class bears the burden to establish that the Rule 1702 prerequisites were met." ***Samuel-Bassett,*** 34 A.3d at 16.

In the instant case, the court found that the class of over fifty putative cotenants was sufficiently numerous. Trial Ct. Op. - Class Cert., 11/17/20, at 10. Second, the court opined that common questions of law or fact existed, even though it acknowledged that each individual cotenant would first have to establish their ownership interest.[12] ***Id.*** at 10. Specifically, the court found the following common questions existed: "whether the Class Members have been paid their pro-rata share of the coal royalty, and non-mining revenue, and the amount due each Class Member based upon RAC's royalty formula and whether RAC is obligated to annually provide a full[,] complete[,] and accurate accounting of all revenues derived from the Coal Tracts." ***Id.*** at 11. The court found the only relevant differences among the class members would be their specific ownership percentages. ***Id.***

The court additionally opined that Sher's claims were typical of the class and that he would fairly and adequately represent the class. ***Id.*** at 11-13. In so doing, the court discounted RAC's claim that Sher had failed to move promptly for class certification. ***Id.*** at 13-14. It also opined that Sher's

_____

whether the prosecution of separate actions . . . would create a risk of [] inconsistent or varying adjudications[.]" Pa.R.Civ.P. 1708.

[12] While the parties disputed the class membership, the court determined the class members in October 2024.

attorneys would "adequately represent the interest of the class and that Sher has adequate financial resources to assure that the interests of the class will not be harmed," and that Sher did not have any conflicts of interest. *Id.* at 14. Finally, the court concluded that a class action provides a fair and efficient method for adjudicating the controversy. *Id.*

RAC claims that the trial court erred in certifying the class when the class members "are fractional owners of real property with separate and distinct titles and failed to meet all the necessary criteria for a class to be certified." RAC Br. at 18, 44-49. RAC first asserts a "structural" defect in certifying a class of tenants in common because "[t]heir interests are several, direct and definite." RAC Reply Br. at 3-5; RAC Br. at 44-46 (quoting *Callen v. Callen*, 83 Pa. D. & C. 212 (Pa. Ct. Com. Pl. 1952)).[13] RAC argues that Cotenants' "[s]eparate deeds create separate duties and destroy the commonality, typicality, and manageability that are indispensable prerequisites to class certification." RAC Reply Br. at 3.

---

[13] The court in *Callen* relied upon the following passage in the 1868 decision in *Mobley v. Bruner*, addressing tenants in common:

> Tenants in common have several and distinct titles and estates, independent of each other, so as to render the freehold several also. They are separately seised, and there is no privity of estate between them. And consequently they must sue separately in actions that savor of the realty, though they join in actions relating to some entire and indivisible thing, and in actions of trespass relating to the possession, and in debt for rent but not in an avowry for rent[.]

59 Pa. 481, 483–84 (Pa. 1868).

- 19 -

We find no basis in the caselaw for a categorial rejection of class actions for tenants in common where the class otherwise satisfies the requirements set forth in Rule 1702 governing class actions.[14] We agree that tenancy in common involves "an estate in which there is unity of possession but separate and distinct titles" so that cotenants would have distinct claims relating to their individual titles. *Bastian v. Sullivan*, 117 A.3d 338, 345 (Pa. Super. 2015). The claims of the instant class of cotenants, however, do not relate to differences in their individual titles but to the royalties and rents owed by RAC, which RAC has seemingly applied uniformly to all cotenants since 1961. Trial Ct. Op. at 8. We emphasize that RAC, in fact, relies upon the 2000 Memorandum as establishing terms common to all cotenants, regardless of any differences relating to the titles. Accordingly, we reject RAC's categorial challenge to the class.

Next, RAC challenges the class based on numerosity, arguing that fifty cotenants are not so numerous as to be impracticable to join, noting that the same cotenants had been named individually in eminent domain litigation relating to the Lee Tract. RAC Br. at 47-48. It further argued that the class "was inappropriate to certify as a class action" given that the court required four years and multiple hearings "to determine the identity and review the nature of title of the class members[.]" *Id.* at 48.

---

[14] Indeed, RAC acknowledges that the decision in *Callen* predated the enactment of Rule 1702. RAC Brief at 45.

Cotenants respond that (1) joinder would be impractical where the class is comprised of approximately fifty heirs that reside in multiple states with many having small holdings and (2) separate suits would be excessively burdensome as many of the class members' shares are so small that it would not justify individual suits and would result in duplicative expenses across the class members. Cotenants' Reply Br. at 36-39.

Upon consideration of the record and the parties' arguments, we conclude that the trial court properly exercised its discretion in finding that approximately fifty individual cotenants, many with small holdings, satisfied Section 1702's numerosity requirement.

RAC's final challenge to class certification addresses Pa.R.Civ.P. 1707(a), which governs the time for filing motions for certification of class actions and relevantly provides as follows:

> (a) Within thirty days after the pleadings are closed or within thirty days after the last required pleading was due, the plaintiff shall move that the action be certified as a class action. The court may extend the time for cause shown. If the plaintiff fails to move for certification, the court if so notified shall promptly set a date for a certification hearing.

*Id.* The comments to the Rule explain that "[a] representative party who does not move promptly may be charged with failure to represent the class adequately." *Id.* cmt.

RAC asserts that the court erred in certifying the class "considering [Sher's] egregious violation of Rule 1707" in which he delayed filing a motion for class certification for four years. RAC Br. at 49. It contends that "[t]his

inaction frustrated Rule 1707's directive that certification be resolved as soon as practicable and demonstrated the absence of the requisite vigor necessary for class representation[.]" RAC Reply Br. at 11 (citation and internal quotation marks omitted).

The trial court rejected RAC's claims related to Rule 1707. Trial Ct. Op. - Class Cert. at 12-13. The court instead opined that "Sher has shown through counsel that he will be able to adequately pursue resolution of this controversy with the requisite vigor and interest to the class." *Id.* (citation and internal quotation marks omitted).

This Court will not overturn the court's certification decision simply because evidence in the record could support the contrary result; rather, we will find an abuse of discretion only if the court made an error of law or "exercised unreasonable judgment, or based its decision on ill will, bias, or prejudice[.]" *Samuel Bassett*, 34 A.3d at 15 (citation omitted). RAC failed to meet that high standard. While Rule 1707 and its comment would have permitted the trial court to find counsel inadequate based on the failure to seek timely certification, the rule does not require that result. As the trial court here had first-hand knowledge of counsel's representation through years of litigation in this case, we defer to the court's assessment of counsel's ability and reject RAC's claim.

## B. Real Estate Taxes

RAC challenges the court's imposition of the "mineral taxes owed on the properties being actively mined[,]" including the imposition of a real estate

tax reimbursement of $105,068.43. RAC Br. at 49-51 (capitalization omitted). RAC emphasizes that the 2000 Memorandum provided that the cotenants were responsible for their share of real estate taxes beginning with the year 2000. *Id*. at 49-51. RAC argues that this should have been imposed as a term of the implied contract.

We reject RAC's reliance on the 2000 Memorandum. As explained above, the trial court did not rely on the 2000 Memorandum as establishing an implied contract. Rather, the trial court found that the parties' rights emanate from their statuses as cotenants in and out of possession and thus, the remedy is an accounting which includes determining a fair and reasonable royalty. In doing so, the trial court found that "[i]t is longstanding and customary practice in mineral leasing for the entity that is mining the coal or mineral and receiving the revenue and tax benefits of mineral extraction to pay the land or mineral property taxes." Trial Ct. Op. at 30. Considering this finding, we conclude that the court did not abuse its discretion in imposing on RAC the responsibility "for all real estate taxes and insurance premiums related to any tax parcel (surface or mineral parcel) on which it is actually mining or intends to mine in the future." Trial Ct. Order and Verdict at ¶ 7.

Next, RAC argues that the doctrine of laches should bar Cotenants accounting claims related to the taxes. RAC Br. at 51. While RAC raised laches in both its answer and new matter and in its post-trial motions, the trial court did not address it expressly in either its October 10, 2024 opinion or in its November 24, 2024 opinion denying RAC's post-trial motions, despite

acknowledging that RAC raised the issue. Trial Ct. Op. at 3; Trial Ct. Op. - RAC's Post-Trial Mot., 11/27/24, at 2. The court's failure to address this issue, however, does not prevent our review where the party preserved the issue below and briefed it to this Court. *See In re Est. of Devine*, 910 A.2d 699, 702 (Pa. Super. 2006).

The equitable doctrine of laches "bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another." *Fulton v. Fulton*, 106 A.3d 127, 131 (Pa. Super. 2014) (citation omitted). A party asserting the doctrine must demonstrate "a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice to the respondents resulting from the delay." *Id.* (citation omitted). The question of laches is factual and is determined by examining the circumstances of each case." *Id.* (citation omitted).

This Court has acknowledged that statutes of limitation expressly do not alter principles of laches, *see* 42 Pa.C.S. § 5501(c); nevertheless, we have observed that statutes of limitation may "provide guidance in determining the reasonableness of any delay" and, indeed, that generally "laches follows the statute of limitations." *Morgan v. Millstone Res. Ltd.*, 267 A.3d 1235, 1244–45 (Pa. Super. 2021) (citation omitted).

RAC avers that it suffered prejudice due to Cotenants' 15-year delay in challenging RAC's deduction of taxes from the royalty payments. RAC argues that it "relied on the course of dealing to structure royalty payments, allocate tax responsibilities, and invest in its mining operations." RAC Reply Br.at 15.

Responding to Cotenants' contention that laches, as an equitable doctrine, is inapplicable to a statutory claim for an accounting, RAC cites Pennsylvania law as providing that "a suit for accounting, including the assessment of taxes, can be barred by the Doctrine of Laches when it is brought twenty [] years after the business relationship between the plaintiff and defendant occurred."[15] RAC Brief at 51 (citing **Tozier v. Brown**, 51 A. 998 (Pa. 1902)).

After careful consideration of the facts of this case, we find laches does not bar Cotenants' claims. The trial court limited Cotenants' claims based upon the six-year statute of limitation. 42 Pa.C.S. § 5527(b). Given the application of the six-year limitation period, we reject RAC's claim that it was prejudiced by the 15-year period of delay in Cotenants' objecting to the assessment of taxes. We, thus, conclude that that the doctrine does not apply to bar Cotenants tax claims.

### C. Prejudgment Interest

In its final issue, RAC challenges the court's imposition of prejudgment interest. RAC Br. at 51-52. It avers that "pre-judgment interest should only be awarded when there is a breach of contract for a definite sum, which was not present in this matter." *Id.* at 18. Essentially, RAC argues that yearly royalty rate adjustments and the tax reimbursement were not due to a breach of contract. *Id.* at 52.

---

[15] Based upon our resolution, we do not address whether Cotenants claim for an accounting sounds in law or equity.

We review the grant of prejudgment interest for abuse of discretion. ***Linde v. Linde***, 220 A.3d 1119, 1150 (Pa. Super. 2019).  A court may award prejudgment interest as "not only a legal right, but also as an equitable remedy awarded to an injured party at the discretion of the trial court."  ***Id.*** (citation omitted).

This Court recently affirmed the imposition of prejudgment interest following the Supreme Court's remand in ***KEM Resources I***.  ***KEM Resources, LP v. Deer Park Lumber, Inc.***, 2025 WL 3772175 (Pa. Super. filed Dec. 31, 2025), *reargument denied* (Mar. 12, 2026) (unpublished decision) ("***KEM Resources II***").[16]  In that case, we concluded that, in the absence of any indication of wrongdoing in the litigation, the trial court did not abuse its discretion in imposing prejudgment interest for the six years prior to the commencement of the action in equity seeking an accounting relating to cotenants' interest in oil, gas, and mineral rights.  ***Id.*** at *5-6.  This Court affirmed the award of prejudgment interest "based in equity and fairness[] and not penalization."  ***Id.*** at *6.  We observed that, while "it may appear unreasonable to require appellant to pay interest for a long period when it had no control over the litigation, it appears equally unreasonable to deprive appellees of the fruit of the use of their money during a period when they also

---

[16]  ***See*** Pa.R.A.P. 126(b) (providing that "unpublished non-precedential memorandum decision[s] of the Superior Court filed after May 1, 2019" "may be cited for their persuasive value").

had no control over the course of the litigation." *Id.* (quoting *Schiller v. Royal Maccabees Life Ins. Co.*, 759 A.2d 942, 945 (Pa. Super. 2000)).

We find this Court's recent decision in *KEM Resources II* persuasive in permitting the trial court to impose pre-judgment interest for an accounting claim between cotenants regarding mineral rights. In this case, the court awarded prejudgment interest because RAC's held royalties due to Cotenants. As in *KEM Resources II*, we affirm with the court's award of pre-judgment interest.[17]

As neither Cotenants nor RAC have presented a claim warranting reversal, we affirm the trial court's orders.

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/27/2026

---

[17] Although the trial court here relied upon precedential caselaw addressing the calculation of prejudgment interest as it relates to contract claims, *see* Trial Ct. Op. – RAC's Post-Trial Mot. at 2-3 (citing *Davis v. Borough of Montrose*, 194 A.3d 597, 612-13 (Pa. Super. 2018)), the court recognized that an award of prejudgment interest is also "an equitable right within the discretion of this Court." *Id.* at 3. It is well-established that "this [C]ourt is not bound by the rationale of the trial court[ ]and may affirm on any basis." *In re Jacobs*, 15 A.3d 509 n.1 (Pa. Super. 2011).